Good afternoon. Here we are again. I can see all the lawyers on the screen and ready to go. And who's going first? Mr. Rizumno? Yes, Your Honor. Okay, you may proceed. Good afternoon. May it please the Court, my name is Daniel Rizumno and together with John Gleason, we represent Appellants and Cross Appellees, a lobby foundation in 650 Fifth Avenue Company. I'll be arguing the seizure and remedy issues. Mr. Gleason will be arguing the 985 or probable cause issues. Claimants asked this Court to affirm the District Court's ruling that the December 12, 2019 order affected a seizure of real property, the building at 650 Fifth Avenue, without a hearing, opportunity to be heard, or a finding of probable cause. That was a seizure, not a restraint. The foundation lost, and the claimants lost, all of the rights to manage the property, to physically occupy it. I'm having difficulty. I mean, what is the difference between a seizure and a restraint? How do we decide whether one is a seizure or whether it's a restraint? The answer to that, Your Honor, is in U.S. v. Jacobson, a Supreme Court case, in which the Court focused on the meaningfulness of the interference. However brief, duration is irrelevant, but how meaningful is the interference? And in December of 2019, Judge Preska took away all rights to the property, physical possession, even rights to access books and records. The government has suggested that this really is only about rent. That's not true. After December 12, 2019, claimants went back to seek modification of the protective order, and we sought to restore management rights. We sought to restore the right to rental income, but also physically occupy the property and use the property. And that is what we sought. This was a wholesale seizure of every right. Just like what happened in September 2017, a restraint is something less. The statute even refers to lease pendants is not a seizure. If it were to say that the government were allowed to say, you can't use the property for unlawful needs, you had to notify us, you had to give us the right to inspect the property, that would be a restraint. But the meaningfulness of the interference is the significant part. Here, all rights were taken away. And James Daniel Goode, the Supreme Court, has said, even if the only restriction is on the tangible right to receive rent, that's enough for a seizure. I have to say something. Assuming it's a seizure, Goode and a lot of the other cases and circuits were about 871. And the statute that this case involves seems to have an additional item, and that is that proceeds of the charge violation are covered. And I'm wondering if that is a significant difference from the 871 cases, which I think Goode was one of them. OK, well, answer. You got the idea of where I'm going. I do. I do, Your Honor. And I think you've had 881A7. And this case is 981. But the critical point, Your Honor, is out of the cases that we cited, several of which are 981 cases, the same remedy has been imposed. The return of wrongfully withheld rental income. 881A7 is not different. 881A7 allows for the government to forfeit real property or interests in real property. The government, as you know, in this case, has said the right to receive rental income is an interest in real property. And certainly to the extent that the government were able to seize and forfeit real property under the relation back doctrine, they gain ownership of the real property at the time of the criminal offense. I thought interest in real property were things like a life estate and that proceeds were different. Well, certainly interest in real property could be a partial interest, like a 95 percent interest. It could be a leasehold interest or anything of the sort. But there is no question that if the interest is the right to receive rental income, that certainly is an interest in real property. And I would say under 985, the statute that's relevant here, in addition to due process clause, it says the only way that you can meaningful interfere with the interest, in this case, right to receive rental income, is under 985D, which requires a pre-deprivation hearing or with a meaningful opportunity to be heard to show probable cause or exigent circumstances and probable cause. Judge Prescott found that the government had not established either and never even attempted to do that. So the issue here is this was an unlawful seizure. It is identical to those other cases. The government focuses on cosme. I want to address that because the Supreme Court has distinguished real property cases from personal property cases. And I should note at the outset that this argument about remedy has been waived because the government chose strategically not to raise it before the district court. But the Supreme Court in James Daniel Goode said that the interference with real property is a private interest of historic and continuing importance and affects a far greater deprivation than the loss of personal property. Post-deprivation hearings, James Daniel Goode and I quote, would not cure temporary deprivation that an earlier hearing might have prevented. And that holds true even with just the tangible right to rental income. Cosme is distinguishable for at least three other reasons. One is cosme was a criminal forfeiture case. I thought it started as a civil forfeiture case. No, cosme was criminal. And what happened in cosme is that the government charged Mr. Cosme and established probable cause for his crimes, but did not establish probable cause to show the property in question was subject to forfeiture. So it never established probable cause. It was an unlawful seizure as this court found. But what's important about that is with criminal forfeiture, the government still had to go to the grand jury, still had to prove that there was a crime committed and criminal forfeiture is in personam. So the crime was committed against this individual. The forfeiture was against this individual. Also important in that case, Your Honor, is cosme was a Fourth Amendment case. The Fifth Amendment was not an issue. And the Supreme Court in James Daniel Goode said the Fourth Amendment does not provide the sole measure of constitutional protection that must be afforded to owners in forfeiture proceedings. And the reason for that, with a Fourth Amendment violation, the affected party has some sort of remedy. You can bring a Bivens action against the government for a Fourth Amendment violation. You cannot. This court in U.S. v. Parcel of Property said there is no remedy. The only remedy is what Parcel of Property recognized, albeit in dicta, that the equitable disgorgement of wrongfully withheld rent. And that's critical that you have a remedy for deterrent purposes. Mr. Rizzone, you're way over your time. You have two minutes for rebuttal. Let's hear from Mr. Gleeson. Can I just finish this one point, Judge Shin? Go ahead. Go ahead. On this deterrent point, I want to make the point that deterrence is important because the same assistant U.S. attorney in COSME is the U.S. attorney in this case. There was an unlawful seizure there. And despite the finding, there was an unlawful seizure here. All right. Thank you. John Gleeson for the claimants. Judge Shin, thank you for allowing us both to address the court. We're grateful for that. The probable cause finding cannot stand for two reasons. It was based on tainted evidence that supported the finding. And second, we were not allowed to assert our statute of limitations defense. Briefly, as to the first, Your Honors, the government says twice in its letter to the court that it can use tainted evidence in what it calls preliminary proceedings. But that's not only not true, but there was nothing preliminary about the proceedings before this court now. After a blistering oral argument and a blistering opinion, I'll suggest to the court, the prosecutors got tired of this court telling them what to do and tired of us expecting them to do it. So the day the mandate issue, there was an about face, a change of course, and the government went for the ultimate shortcut to cut off the funds for our defense. Had you been, refresh my recollection, you had been, the government agreed to give you funds during what, defense funds during what period of time? During the entire period of time, the case has been pending, which is more than a decade, except for the periods in which there was a yet to be, a yet unreversed judgment against us. That's why there was never a probable cause determination. There was an agreement back as early as the case began to allow access to the rental income. And it was only during the period when there were judgments against us, first Judge Farr's summary judgment, and then second based on the jury verdict, only when they were in force and unreversed did we not have access. What happened, Your Honor, was when the moment your mandate issued in December of 2019, the government took a different course. It decided for the first time to seek this relief and, you know, choices have consequences. And here, our motion to suppress, because of that choice to wait more than a decade, our motion to suppress wasn't just an aspiration. It wasn't just like a motion to suppress raised in a grand jury proceeding or a detention proceeding. It had been before this court twice. It was granted. It was a flagrantly illegal search, and you specifically told the government what it needed to do. You wrote in that opinion in 2019 the government submit a chart or similar evidence documenting how it would have obtained each particular piece of evidence. Have they done that? No, no, Judge. What do you mean they haven't done it? You haven't received that yet? No, no, there was no, there's no effort to comply with that order. The government is so casual in its disregard of that order. It submitted an ex-party presentation that said it wasn't relying on illegally seized evidence. We said, yes, it is. Here's four documents. And they said, OK, well, sorry, never mind about that, in a letter that alluded to even more illegally seized documents. Judge Preska relied and the government put before her tainted evidence, the Ebrahimi journals. I don't have time here because I know... Judge Preska specifically said she was not relying on the allegedly tainted evidence. She did say that, but, Your Honor, there's no way to know until the government complies with the directive this court gave it. There is no way to know whether or not there was reliance on tainted evidence. It's not our burden, I say to this court respectfully. You see in Justice Sotomayor's decision when she was on this court in Crimstock. There's an obligation on the government's part to show untainted evidence. We're not in a position, absent the government complying with this court's directive, to show that it was tainted. I mean, can you identify the tainted evidence that Judge Preska relied on? Well, yes, I can. And I'm going to suggest to this court, based on... And if you look at page 11 of our letter, just in case I run out of time, Judge Chin. We've walked through all of the ways in which the affidavit that resulted in the search of Ebrahimi's home relied on the tainted evidence. The affidavit relied on it in five paragraphs in his affidavit. The agents whose testimony is relied upon, Ennis and McWilliams, were the ones principally responsible for reviewing the tainted evidence. The interviews, two of the interviews of Ebrahimi himself, occurred between the illegal search and the affidavit that produced the search of his home. And again, Judge, we think that even if the burden were on us, we think we've satisfied it. But the point I really want to emphasize that is our position, it's not on us. The untainted evidence is an obligation. They're demonstrating it was untainted. It's the government's obligation. I wanted to ask you a question about some evidence, just putting aside the argument you're making now. I understand it. But I thought the district judge, whatever else happened, was emphasizing the destroyed documents and the correspondence with Wachovia about Asa's potential ties to the Iranian government. And I thought that was kind of the essence of what motivated her finding. And do you have any problem with that particular evidence? Well, we do. We have a problem with the inferences that were drawn. But more to the point for this appeal, Judge Bastani, we have a problem with square corners not being turned in this case. In our view, once they are, if this court does not put up with the government disregarding its directions to the government, and I haven't gotten the statute of limitations, I hope Judge Chin gives me at least a minute to do that. I don't want to say all we want is a proceeding that turns square corners because that's a big deal. This is an effort to forfeit a building on Fifth Avenue in which we think once we have our rights respected, that building will not be forfeited. And if I can turn briefly, Judge Chin. Before you move on to that, the issue of the evidence, what was the discussion with the district court? Did you say we don't want to proceed until we get this evidence or did you not make that argument? No, we wanted statute of limitations. No, no, no. I meant on the issue of the government's compliance with the prior orders. Did you raise that issue? Did you say we can't go forward? You did. Yes. I have one question, Mr. Glaser. Let me be sure I understand exactly why you think Judge Preska got the date wrong with respect to that frames the interval on which you believe you're entitled to the return of funds. Judge, we think Judge Preska respected this court. After this court, after the appeal came to this court long before the reversal back in January of 2018, this court entered an order that essentially seized our property rights in the building. It didn't get back to Judge Preska until the mandate issued in December of 2019. We think that Judge Preska only ran the relief back to December of 2019 out of respect for the fact that prior to that date, it was this court's order, not hers, that had seized the. What do you think is the correct date and why? The correct date is January 5th, I believe, is the precise date, 2018, because that's the date after which the property right to receive the rental income was cut off by this court. And we respectfully suggest that once the court, a year and a half later, reversed the judgment on which that seizure was based, that obviously Judge Preska should have gone back to that date. The not going back to that date can't be reconciled with the rationale of her opinion. But we think she didn't do that out of respect for the fact that the district court was not the court that entered that seizure order. Why don't you take a minute on statute of limitations? I will. And thank you, Judge. We appreciate it. Very quickly, we claim, here's the truth. If the government discovered or possessed the means to discover before November of 2004, what it claims were sanctions violations, this whole case is time-bombed. And without even getting the discovery, this court has ordered twice, not getting a single page of it on remand. We've already demonstrated that for 25 years prior to that November 2004 date, there were investigations by the FBI and the IRS and OFAC. And I'm going to suggest this to the court. If you're looking for the most compelling reason why the government decided to try on remand, why it flipped its course completely to try to shut us down, this is it. Because when we get this discovery, it's going to be painful for the government. I don't have time. In the time allotted, we're happy to provide the court with a painful, shameful, rope-a-dope approach to this by the government. It culminated in June with us just saying, look, fine, you say COVID is the problem, all these problems. Give us a status report. We asked eight concrete questions. Who did you contact? When? What documents? What's the problem? No answer. No answer. We asked them in July. No answer. August 10th. What's up? They go, working on a response. We never got the response. There's a reason the government flipped course when this case went on remand within hours of the remand order. And the reason is it does not want to provide the statute of limitations discovery that this court ordered. One more sentence, Judge. We don't think it's right. We don't think it's right that the government pays us no mind. We're getting used to it. But please don't let them pay you no mind. That's what they've done after two appeals. Thank you for the extra time. Thank you. We'll hear from Mr. Tracer. Yes. Good afternoon. May it please the court. My name is Daniel Tracer and I represent the United States on this appeal and the proceedings below. Why haven't you provided the material concerning the improperly seized documents that we told you to give them? Sure. So for purposes of the preliminary hearing here to establish probable cause, we've disclaimed reliance on any of those documents. And so we understand the court has instructed us. Our direction to you was not contingent. We didn't say do it when you found it convenient or do it when you felt like it or do it when you felt it served your orders. That opinion, I hope you've read it recently, could not have been clearer what we expected of the government. Absolutely. And we understand. You haven't done it? No, we have not provided yet. Have you done it? How many documents are we talking about? So the seizure itself, as the opinion said, was about 200 boxes. But the question is, we have still... All right. 200 boxes. How many of the boxes have you complied with? We haven't provided the district court with any of that particular analysis yet. In other words, showing which documents would have been inevitably discovered. Why not? That is something we understood will be done on a schedule in conjunction with the district court in advance of trial, given that we would need to do that in order to rely on any of those documents at trial. But it wasn't clear that this directive was a condition on you using those documents in the course of this litigation. What did you think we were talking about? So we understand that any documents for which we fail to comply with that directive will be suppressed. And so we understand that we need to proceed with that. But don't... I mean, it's not just a matter of whether you want to rely on it. It's possible that they want to rely on some of these documents and you haven't produced them. Isn't that a possibility? So, no. Everything has been... That would be a separate concern. Everything has been produced to the claimants. And in fact, they've relied on many of those documents. So, for example, there were some documents that... What about the additional 200 boxes? Might there be some things in there that could be useful to the claimants? So everything that's been seized has been provided... The question is not sharing with them the information. The question... And they've produced all of it back to us as part of the discovery request. But the question is if we want to... And in fact, like I said, they've relied on many of those documents before this court and before... My point was simply this. Your response to Judge Parker was that you weren't going to rely on those documents and therefore you didn't produce them. And all I'm asking is, in response to that argument, is it's not necessarily just about what the government wants to rely on. They may want to rely on some of those documents that they haven't seen. In that case, I misspoke. I didn't mean to say we didn't produce them. I meant to say we didn't produce an analysis on a document-by-document basis. Isn't that what you were instructed to do? That is something that we're required to do. Do you have better things to do than comply with what the Court of Appeals tells you? Do you have more pressing things in your business, in your day-to-day work? Of course not, Your Honor. Let me ask you this. You remind me of the date you cut off payments for fees. What was that date again? I think it would be helpful to... Judge Preston's order was in December 12, 2019. What's the date? Judge Preston's order that's at issue here was December 12, 2019. And you had agreed to pay legal fees up until what date? Until the middle of 2013. At that point, there was literally... And then you continued to pay legal fees until what date? Oh, so fees were actually paid until January of 2018. I think I agree with Judge Gleeson. It was January 5, 2018 was the date until which they were able to receive paid money toward legal fees. And so now is the government's strategy, having taken a bath in two proceedings in this court, to try to squeeze Patterson and squeeze Debevoise out of this case? Absolutely not, Your Honor. Sorry? Absolutely not, Your Honor. That has never been our intention. We have sought since the middle of 2013, under the governing law of Monsanto and Kaplan and Drysdale, which are Supreme Court cases that are exactly on point here, to restrict the spending of funds, not to prevent the rent from being collected by claimants. It's allowed to be collected, it's allowed to be used... But what changed? I mean, what prompted the government's change in the treatment of these funds? So as of November 2013, I can't speak to exactly who was doing what at that point. But for the beginning of the time period, up until 2013, the parties were comfortable with a compromised position. As the case progressed into 2013, there had been years of expenditures, there were settlements reached with judgment creditors, and the prevailing Supreme Court precedent was clear that the money couldn't be spent. Now, at that point, we were overruled by the court. The court disagreed with us, and so it became the law of the case until the late 2017, early 2018 period. And in the course of the proceedings that came before the appeal in this court, there were multiple rounds of briefing on this issue. And this court decided, to be clear, not because there was a verdict, but based on Monsanto and Kaplan and Drysdale, that's the authority that is cited in this court's January 2018 opinion, that the funds should remain restrained. The funds will be there whoever wins the case, as this court said in the remand order, pending adjudication on the merits. And so if a lobby wins, that money is there for a lobby. And if not, it's there to be consistent. And at the rate this case is proceeding, that will be another decade down the road. And the case is going on for years and years and years because of the government's mishandling of these proceedings. You got reversed on the summary judgment in a scathing opinion. You got a reverse by Judge Wesley following the trial in an opinion, the likes of which you really don't see very often from this court. Might I change the topic? I don't know if I have the right lawyer here. I wanted to talk about Cosme. Do I have the right lawyer for that? Yes, Your Honor. Okay. He has said that Cosme doesn't bind us because it's real property. It's a criminal case. I mean, it's personal property. It's a criminal case. And you tell me why he's wrong. Sure. Cosme is the controlling authority here. And let me distinguish for a second Cosme versus James Daniel Goode. James Daniel Goode and all of its progeny that claim in sight, 11th Circuit cases, 2nd Circuit cases, 8th Circuit cases, those cases involve a complete lack of process. In other words, the government comes in with an arrest warrant in rem or no trespassing signs or a seizure warrant and takes property before the case even starts and before anybody has notice of anything. That's a line of cases that is inapplicable here and has no bearing on this case because all the orders in this case were entered during the course of and after years of litigation. And I realize I'm over my time and I'll proceed with it. I want to just continue with this for a minute if Judge Chin would let me. It's fine. Judge Chin, can I keep going? Yes. Okay, thank you. All right. Is there any meaningful difference between the statute involved in those cases and 981? And I mean with regard to proceeds. Does that affect anything? There absolutely is. So another thing that you see in James Daniel Goode and its progeny is that the case involves 881 where the rent is only being seized by dint of grabbing the building. Here, the government is pursuing under 981 forfeiture of the funds themselves. And so given that that line of cases does not apply here. Because they're proceeds? Sorry? Because they're proceeds? Correct. Because every penny that the building generates proceeds is a form of money laundering and proceeds that come from the building are subject to forfeiture separately. And if they're spent here, there's no question that they will be dissipated. And the dissipation of funds runs counter to every court, South Livonia, Cosme, and every court, Dakarat, that has said that even the illegal seizure of funds does not render them immune from forfeiture. Okay, Judge Chin, I have my answer. Thank you. Thank you. What about the statute of limitations discovery? That has not been produced either. So if I can just explain what is happening with that. It has not been produced, Your Honor. What happened there was even before the mandate issued, the government began the process of looking into those documents. The claimants, by definition, are seeking documents that are very old, often do not exist in electronic copy, and exist in FBI offices around the country. And so even before the mandate issued, we made efforts to begin gathering those and digitizing them. And we understand that the FBI has put work into that. Well, look, you say quite prominently in your briefing in this case that this is the biggest forfeiture case that the federal government has ever brought. And the case has been pending for nearly a decade. Are you seriously telling us you just haven't had the time to gather up the statute of limitations documents? No, that's not what we're saying. I'm trying to put some context on what we've done to date. We then received claimants' discovery requests in February. We provided our objections and responses in April. And then COVID hit. And that has, as Judge Gleeson said, created a substantial difficulty here. How do you... They make a pretty strong prima facie case that the statute has run. How do you know that the statute hasn't run if you haven't looked at the relevant documents? So, Your Honor, we would disagree strongly with their characterization of the evidence about statute of limitations. It's essentially some stray references in FBI reports and news articles that have all kinds of unsourced reporting in them. By contrast... But you don't know because you haven't looked at the documents, right? We've looked at all the documents. Didn't that what you just told us? You said they were scattered around the country. Some of them were in electronic and they were complicated and burdensome. That suggests to me another way of saying that most of these documents you haven't really even looked at. Well, there are certainly some documents we haven't looked at, but there are two reasons why we're confident that statute of limitations ultimately will not prevail here and certainly shouldn't prevail at the stage of probable cause. Number one, because as we set out in our opposition to the TRO, all of the evidence that's at issue in this case only came after 2005 and that's when the government first developed the confidential informant in this case who provided government of Iran documents that led to this particular investigation and these particular charges. Second of all, there were continuing violations in this case up until the day before the amended complaint was filed and so to hold otherwise would mean that a drug dealer could continue dealing drugs up until the day before the indictments filed, but if the government knew he was dealing drugs beforehand, they couldn't prosecute him and they couldn't hold him accountable. All right. Let's hear from Mr. Patrick Ciali. Good afternoon and may it please the court. Patrick Petrucelli from Stork & Stork & Levan. I represent some of the judgment creditors who Mr. Tracer referenced during his submission who settled with the government in 2014, which was after Judge Forrest issued the summary judgment decision in the government's favor in 2013. Collectively, the judgment creditors, including the ones that I represent, hold over $4 billion in unsatisfied money judgments against Iran to compensate them for injuries that they suffered during terrorist attacks, and pursuant to that settlement agreement, any funds or property that is forfeited in this case will be distributed to the judgment creditors in partial satisfaction of their very large outstanding compensatory damage judgments. I can assure the panel that from 2014 onwards, the judgment creditors have been firm in their desire that all property be retained and preserved for potential forfeiture and assuming there is a final judgment of forfeiture distributed to the judgment creditors. I want to briefly take a step back and just think about some of the timelines here and some of the specific orders that are at issue because I think that's important for the court to get context of some of the arguments that are being made. Mr. Rizomnes spent a great deal of time talking about the December 2019 order that Judge Preska entered, but I don't understand how an order that was entered in December of 2019 could have illegally seized rental proceeds that were generated from January 5th, 2018 onwards. That's a gaping hole that I submit has not been filled by a lobby. Mr. Gleason said that the restraint that they're talking about goes back to January 5th, 2018. That's actually not what they've said in their papers. In their papers, they've claimed that the seizure occurred in September of 2017 as a result of an order that Judge Farr has entered while she was presiding over this case. That September 2017 order is important because it was actually an order that a lobby opposed, but that order was superseded at a lobby's request by this court in November of 2017. In November of 2017, a lobby made a motion asking to stay the judgment of forfeiture. They requested that this court appoint a trustee to oversee the property. They asked this court to give that trustee numerous powers over the property, and this court granted their request. The September 2017 order at most was a seizure that went from September until November of 2017. From that point on, the September 2017 order was no longer effective. The only order that impacted a lobby's property rights was the November 2017 order. Now, in January, this court granted a motion for partial reconsideration of the November order at the judgment creditor's request. The government also filed papers in that, and that order merely restrained the trustee's authority that she was given over the property at a lobby's request. Judge Chin, to answer your question as to the distinction between a restraining order and a seizure, in our view, the distinction is when you have an order that prevents someone with ownership, dominion, or control over property from taking certain actions with respect to that property, that's a restraining order. 985F3 says that restraining orders need to be treated differently than seizures. Mr. Resumnik claims that James Daniel Goode already addressed the question of whether a restraint is a distinction between a seizure and a restraint because in that case, there was no dispute that the government actually had effectuated a seizure. Here, the trustee was given dominion and control over the rental proceeds at a lobby's request, and this court, in January of 2018, entered a restraining order prohibiting her from allowing a lobby to access her second account. I also want to point out very briefly, Mr. Resumnik talks about a list pendants. The list pendants provision is in a completely separate portion of 985. That's in 985D12. It references restraining orders, it references list pendants, and it references bonds. The provision that we're relying on is 985F3, which specifically says restraining orders are meaningless. Under their view, there is no distinction between a restraining order and a seizure, and the authority that Congress gave to courts would be read out of the statute, and we submit that that is not appropriate. Go ahead, Judge Chin. I was going to say, you're way over. Thank you. Thank you, Judge. I just want to address the very points that were raised. In the government's argument, they challenged our right to receive rental income and other property rights in 2013. That is flat-out wrong. In 2013, after the judgment came in, after the summary judgment, they did challenge the right of ours to manage the property and right to receive rental income. It's not really a fair assessment because, as Judge Gleeson said, when there was a forfeiture judgment, the government opposed it. The critical issue is after the appeal where the summary judgment finding was vacated in 2016, the government consented to go back. They originally had an issue about management. They never challenged our right to receive rental income, and claimants did receive rental income from 2016 all the way until after the trial in 2017 September. So when they say they opposed it in 2013, that's not the full story. It was only after summary judgment, summary judgment was vacated. On consent, as Judge Forrest found, the property management rights were returned. Rental income right was returned. If the government wanted to do that, if they wanted to take away our rights as property owners, they could have had a probable cause hearing. They chose not to do so. As Judge Gleeson said, choices, strategic choices matter. Judge Shin, you asked about why don't we have the documents and isn't it true we want to rely on the documents. Certainly, statute of limitations documents are critical. We haven't received a page, even though these statute of limitations discovery requests were filed in 2011, and in 2016 this court directed that statute of limitations discovery be produced. Mr. Tracer said that a request wasn't made until February. I thought there had been earlier requests for these materials. There have been, for both of these materials, for statute of limitations, the discovery request was made in 2011. In 2016, we refiled them. What was the reference to February? Yes. After the second appeal and the vacating of that, the government asked us to help them identify the documents that were relevant for statute of limitations discovery because we had cited specific documents. They said, can you give us the FBI file numbers? We re-served discovery with FBI file numbers attached to make it easy. All they have to do is indices, searches in FBI files using the file numbers we provided. So, yes, we re-gave them our same discovery. How is it that you had access to FBI file numbers and they didn't? You've confused me. I'm sorry, Judge. They did have access to these in the discovery that was produced in the early phases before 2013. There were some documents that actually slipped out and they revealed to us that there was a statute of limitations issue here. And we said, now that we see this, give us more. Give us the actual facts about this FBI investigation, the OFAC investigation, IRS investigation. They refused in 2013. They refused again in 2016. But after the second reversal and the second ordering of compelling them to do it, they still haven't produced a single page. But now they're not opposing it. They're just saying they'll get to it in their sweet time. The other point I wanted to suggest, James Daniel Goode, the argument was made that there was a lack of process because it was ex parte at the beginning of the case. I would suggest this is identical because at least in December 2019, within three hours of the mandate issuing to a brand newly assigned judge, the judge said it was imperative to enter this protective order. And without hearing from us, within two and a half hours, Judge Prescott granted that. She recognized it was a seizure, an unlawful seizure, and there was a remedy. But to Mr. Petroselli's point, why January of 2018? Because January 2018 was when our right to receive rental income was taken away from us. And that right was taken away based on a verdict that has been vacated. So it's a legal nullity under Supreme Court precedent. And Judge Prescott focused on when the mandate issued. But if it's a legal nullity, it has to be treated as if it never existed. Now, Mr. Petroselli. Okay. I want to really focus on Judge Rastani's question about COSME. 881, there's two relevant provisions. 881, A6, and A7. A7 focuses on the interest that allows the government to go after an interest in real property. We said that's enough. But 881A6 is virtually identical to 981, the forfeiture statute here. Out of the cases we cited, at least three circuits have relied on 981 to find that the appropriate remedy is the return of rental income. This court has said equitable discouragement is permissible in this very way of returning wrongfully withheld rents. But 881A6 is identical to 981. Those cases that deal with 881A6 and 881A7 also generally focus on 881A6 because it's also pled. There's no distinction between 981 and 881A6 or, I will suggest, A7. Thank you. And just my last question. Mr. Gleason, go ahead. I would be happy to hear that there's nothing I was intending to say that Mr. Rizumna hasn't had an opportunity to say in the address. So I'm happy to give a minute back to the court. All right. Well, thank you all. A well-reserved decision.